AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| ABHIMANYU BATRA,<br>a.k.a. Abhi Batra,<br><br>Defendant | |

**LODGED**
CLERK, U.S. DISTRICT COURT

## 1/24/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____jb_____ DEPUTY

Case No.     2:22-mj-00300-duty

**FILED**
CLERK, U.S. DISTRICT COURT

JAN 24 2022

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344(2) | Bank Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s *Kyle Schultz*
*Complainant's signature*

Kyle Schultz, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     1/24/2022

Judge's signature

City and state:   Los Angeles, California       Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

<u>18 U.S.C. § 1344(2)</u>

Beginning in 2016, and continuing through April, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant ABHIMANYU BATRA, also known as Abhi Batra, knowingly and with intent to defraud, executed and attempted to execute a scheme to obtain monies and funds owned by and in the custody and control of Citibank, Capital One, Bank of America, and Wells Fargo Bank, federally insured financial institutions, by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  To execute the fraudulent scheme, defendant BATRA opened a series of bank and brokerage accounts, often using the identifying information of friends and family members without their knowledge or authorization. Defendant BATRA transferred funds from the bank accounts to the brokerage accounts, where he used them for speculative trading.  When defendant BATRA sustained trading losses, he contacted the banks from which he had transferred the trading funds and falsely claimed not to have authorized the transfers, and demanded that the banks reverse them.  The brokerage firms sustained actual losses of at least $665,211 from these bogus reversals.  Specifically, on December 10, 2019, defendant BATRA, acting with the intent to defraud, called Citibank and falsely claimed $40,000 was fraudulently transferred from his bank account into a brokerage account of someone he did not know in order to get Citibank to reverse the transfer, which it did.

## AFFIDAVIT

I, Kyle Schultz, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since September
2019. I am presently assigned to the Los Angeles Field Office. I
am assigned to the Corporate and Securities Fraud Squad and have
been so assigned since approximately February 2020. The
Corporate and Securities Fraud Squad is responsible for
investigating white-collar crimes such as corporate fraud and
securities fraud, including insider trading, market
manipulation, embezzlement, and investment fraud schemes. I have
led and/or participated in white-collar fraud investigations and
have also participated in the execution of arrest and search
warrants related to multiple fraud investigations. I have
received training in federal criminal statutes related to
financial crimes and conducting investigations involving
financial crimes. Prior to entering the FBI, I was a licensed
attorney in Washington, D.C. I have four years of training and
experience in various areas of the law, including criminal
procedure, corporate governance, federal securities law, and
homeland security law. I also have experience developing federal
regulatory policy related to United States commodity and futures
markets.

## II.  PURPOSE OF AFFIDAVIT: BANK FRAUD COMPLAINT

2.    I make this affidavit in support of a complaint and
arrest warrant for ABHI BATRA ("BATRA") for violation of Title

18, United States Code, Section 1344(2), Bank Fraud.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, financial records and analysis, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.   **THE EARLIER SEARCH WARRANTS TARGETING BATRA**

4.     On January 11, 2021, the Honorable United States Magistrate Judge John McDermott issued a search warrant for 1350 South Roxbury Drive, Apartment 202, Los Angeles, California 90035 ("BATRA's APARTMENT") based on the attached affidavit, which is incorporated by reference.  On January 15, 2021, Special Agents of the Federal Bureau of Investigation ("the Search Team") executed that search warrant, but BATRA was not home at that time.

5.     The Search Team found evidence at BATRA'S APARTMENT indicating BATRA was engaged in a scheme to defraud various banks and brokerage firms, including:

   a. Four Employment Development Department VISA debit cards in the names of Abhimanyu Batra, Poonam Batra, Harivansh Batra, and Mehru Bhatia;

   b. One Chase VISA debit card in the name of Jamile Mavaly;

   c. One Capital One Mastercard debit card in the name of Poonam Batra;

   d. Financial Industry Regulatory Authority ("FINRA") correspondence detailing arbitration proceedings between Tastyworks, an online brokerage firm, and Miranda Casillas ("Casillas"), a suspected identity theft victim in BATRA's fraud scheme, related to a $28,149.17 debt owed on a Tastyworks brokerage account ending in 3010 that Tastyworks records show was opened on March 3, 2019 in CASILLAS's name using an email address belonging to BATRA, cannabis.supreme@gmail.com;

   e. Documents sent from Navient, an educational loan management company, requesting BATRA provide additional information to verify a claim BATRA filed on November 16, 2019 stating BATRA was a victim of student loan identity fraud;

   f. One Apple iPad, with reports visible on the home screen indicating the iPad was used to conduct online trading and monitor stock market activity; and

   g. A handwritten ledger signed by BATRA and Ksenia Pasochnik, a suspected identity theft victim in BATRA's fraud scheme, indicating BATRA had paid Pasochnik $3,000 owed on a $20,000 debt.

   6. On January 21, 2021, the Honorable United States

Magistrate Judge Alka Sagar issued two follow up search warrants for BATRA's person and BATRA's vehicle, a 2020 Landrover sport utility vehicle. On February 2, 2021, FBI Special Agents executed those search warrants.

**BATRA Confessed to Defrauding Investors and Banks**

7.     Prior to serving the search warrants on BATRA, FBI Special Agent ("SA") Kyle Schultz interviewed BATRA. The interview was recorded. During the interview, BATRA confessed, as described in part below:

a.     BATRA registered brokerage and bank accounts in BATRA's name to conduct speculative options trading at various online trading platforms. BATRA funded his online trading activity with personal funds or funds obtained from friends and family.

b.     After suffering trading losses, BATRA recalled the original automated clearing house ("ACH") bank transfers to brokerages and claimed he was a victim of fraud and had not actually authorized the transfers, thereby causing financial losses to the victim brokerages.

c.     BATRA misappropriated personal identifying information ("PII") from acquaintances and family members and, without their knowledge or authority, used the misappropriated PII to open brokerage and bank accounts and conceal the true extent of BATRA's fraudulent trading scheme.

**BATRA Disappeared During Plea Negotiations**

8.     According to immigration records, BATRA is a permanent resident alien and so could lose his residency in the U.S. and

face deportation pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) if
convicted of an "aggravated" felony under immigration law.  I
reviewed an email from BATRA's criminal defense counsel dated
January 19, 2022, in which he states that neither he nor BATRA's
immigration counsel can reach BATRA, and that BATRA's telephone
has been disconnected.  Based on my discussions with AUSA Andrew
Brown, I know this occurred after he had been unable to secure
authorization from his office for charges against BATRA that
would have left the question of whether BATRA's conviction was
"aggravated" contingent on the sentence he received, and thus
would have left BATRA with at least a possibility of remaining
in the U.S.  (8 U.S.C. § 1101(a)(43)(G):  theft offenses are
aggravated if the sentence imposed is at least one year).  Thus
it appears that BATRA disconnected his telephone and stopped
communicating with his counsel after he learned that he would
face deportation regardless of his sentence.  (8 U.S.C. §
1101(a)(43)(M)(i):  fraud offenses for which the loss exceeds
$10,000 are aggravated).

**IV.   CONCLUSION**

9.   Based on the foregoing facts, there is probable cause
to believe that ABHI BATRA committed bank fraud.

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this 24th day of January,
2022.


_____
UNITED STATES MAGISTRATE JUDGE

**AFFIDAVIT**

I, Kyle Schultz, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2019. I am presently assigned to the Los Angeles Field Office. I am assigned to the Corporate and Securities Fraud Squad and have been so assigned since approximately February 2020. The Corporate and Securities Fraud Squad is responsible for investigating white-collar crimes such as corporate fraud and securities fraud, including insider trading, market manipulation, embezzlement, and investment fraud schemes. I have led and/or participated in several white-collar fraud investigations and have also participated in the execution of arrest and search warrants related to multiple fraud investigations. I have received training in federal criminal statutes related to financial crimes and conducting investigations involving financial crimes. Prior to entering the FBI, I was a licensed attorney in Washington, D.C. I have four years of training and experience in various areas of the law, including criminal procedure, corporate governance, federal securities law, and homeland security law. I also have experience developing federal regulatory policy related to United States commodity and futures markets.

## II.   PURPOSE OF AFFIDAVIT

2.   I make this affidavit in support of an application for a search warrant for 1350 ROXBURY DRIVE, APARTMENT 202, LOS ANGELES, CALIFORNIA 90035 ("BATRA'S APARTMENT"), described in Attachment A, for the items described in Attachment B, both of which are incorporated by reference.

3.     As described more fully below, I respectfully submit that there is probable cause to believe that evidence, fruits and instrumentalities of criminal violations of Title 18, United States Code, Sections 1343 (wire fraud), 1028A (aggravated identity theft), and 1956 (money laundering) (collectively, the "SUBJECT OFFENSES") will be found in BATRA'S APARTMENT.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

5.     Between 2016 and 2020, ABHI BATRA orchestrated a fraud scheme in which BATRA opened brokerage accounts in his name, as well as in the names of acquaintances and family members, to conduct speculative options trading. BATRA used ACH transfers from personal bank accounts to fund these brokerage accounts. When BATRA profited from trading activities, he withdrew the profits into his personal bank accounts. When BATRA lost money trading, he recalled the original ACH transfers and claimed he was a victim of fraud and had not actually authorized the transfers. While engaged in his fraud scheme, BATRA lived in and conducted online options trading from BATRA'S APARTMENT. BATRA also used BATRA'S APARTMENT as the mailing address for bank accounts created to further BATRA's fraud scheme.

2

Case 2:22-cr-00103-PA   Document 1   Filed 01/24/22   Page 11 of 27   Page ID #:11
Case 2:21-mj-00134-DUTY *SEALED*   Document 2-1 *SEALED*   Filed 01/11/21   Page 14 of
30   Page ID #:68

# IV.   STATEMENT OF PROBABLE CAUSE

A.   **Batra First Carried Out the Fraud in His Own Name**

6.   BATRA carried out his fraud scheme with brokerage accounts registered in BATRA's name. For example, Tradestation, an online brokerage firm, provided records for an account ending in 8070 registered to "Abhi Batra" (the "BATRA Tradestation account"). The BATRA Tradestation account listed 405 Rockefeller, Apartment 605, Irvine, California 92612 as BATRA's address. A database check and documents provided by the SEC confirmed BATRA lived at this address before moving to BATRA'S APARTMENT.

7.   Tradestation account records show $50,000 was deposited in the BATRA Tradestation account in August 2018 to conduct speculative options trading. Bank of America records confirm this deposit originated from a Bank of America checking account controlled by BATRA. Tradestation records also show that in August 2018, the BATRA Tradestation account suffered trading losses of $32,109.94. Following these losses, $30,000 was withdrawn from the BATRA Tradestation account via an ACH reversal, leaving the BATRA Tradestation account with a negative balance of $20,146.67. At this time, all trading activity ceased in the BATRA Tradestation account.

8.   According to Bank of America records, the $30,000 was recalled from the BATRA Tradestation account to the same Bank of America checking account BATRA used to deposit the funds. Bank of America also provided a fraud report in which BATRA claimed his Bank of America account was compromised, and requested Bank of America reverse the funds from the BATRA Tradestation account because BATRA was a victim of fraudulent ACH transfers. In December 2018, Tradestation was forced to write-off the negative balance in the

3

Case 2:22-cr-00103-PA   Document 1   Filed 01/24/22   Page 12 of 27   Page ID #:12
Case 2:21-mj-00134-DUTY *SEALED*   Document 2-1 *SEALED*   Filed 01/11/21   Page 15 of
30   Page ID #:69

1  BATRA Tradestation account due to Bank of America classifying the
2  August 2018 deposits as fraudulent transactions.

3      9.   OptionsXpress, another online brokerage firm, also provided
4  records for an account registered to "Mr. Abhi Batra" ending in 2063
5  (the "BATRA OptionsXpress account"). The BATRA OptionsXpress account
6  listed 405 Rockefeller, Apartment 605, Irvine, California 92612 as
7  BATRA's address and was opened using BATRA's Social Security account
8  number, date of birth, phone number, and the email address
9  abhibatra11@gmail.com.

10      10.   OptionsXpress account records show $30,000 was deposited in
11  the BATRA OptionsXpress account between June 20, 2017 and August 18,
12  2017. Citibank records confirm this deposit originated from a
13  Citibank checking account controlled by BATRA. Between June and
14  September 2017, profitable trading activity followed by several ACH
15  withdrawals of those profits left the BATRA OptionsXpress account
16  with a balance of $602.68. On September 14, 2017 $23,000 was recalled
17  from the BATRA OptionsXpress account via an ACH reversal, resulting
18  in a negative balance of $22,479.44 in the BATRA OptionsXpress
19  account. At this time, all trading activity ceased in the BATRA
20  OptionsXpress account.

21      11.   According to Citibank records, the $23,000 was recalled
22  from the BATRA OptionsXpress account to the same Citibank checking
23  account BATRA used to deposit the initial $30,000. Citibank records
24  show BATRA claimed he was a victim of fraudulent ACH transfers and
25  requested Citibank reverse the funds from the BATRA OptionsXpress
26  account. In October 2017, OptionsXpress was forced to write-off the
27  negative balance in the BATRA OptionsXpress account due to Citibank
28  classifying the deposits as fraudulent ACH transactions.

Case 2:22-cr-00103-PA   Document 1   Filed 01/24/22   Page 13 of 27   Page ID #:13
Case 2:21-mj-00134-DUTY *SEALED*   Document 2-1 *SEALED*   Filed 01/11/21   Page 16 of
30   Page ID #:70

12.   I received similar reports regarding BATRA reversing ACH charges after claiming he was a victim of fraud involving the following brokerage firms from 2017 through 2020: Ally Investments, January 2017 – December 2019; OptionsHouse, June 2016 – August 2017; Charles Schwab, October 2017 – February 2018; E-Trade Securities, August 2017 – October 2018; Fidelity Brokerage Services, November 2017 – January 2019; Interactive Brokers, September 2017 – March 2018; Tastyworks, May 2018 – August 2018; TD Ameritrade, February 2018 – February 2019; Tradestation, July 2018 – January 2019; and Robinhood, October 2019 – April 2020.

**B.    Batra Continued the Fraud Using Other Persons' Identities**

1.   In addition to conducting trading and fraudulent ACH reversals in his own name, BATRA misappropriated personal identifying information ("PII") from acquaintances and family members to open brokerage and bank accounts and conceal the true extent of BATRA's fraud scheme.

2.   For example, on August 3, 2020, lawyers from the SEC took the deposition testimony of Jonathan Melo, an acquaintance of BATRA. Melo testified that on April 19, 2017, Melo opened an account at Robinhood, an online brokerage firm, in order to invest business earnings in the stock market. Melo also testified that in 2018, Melo asked BATRA to teach Melo how to invest in the stock market.

a.   Text message records provided by Melo show that on March 25, 2019, BATRA asked Melo to provide his PII so BATRA could access Melo's Robinhood brokerage account and make trades for Melo. BATRA sent this text message from the phone number 310-666-4284. Documents and records obtained during my investigation identify this phone number as belonging to BATRA. Melo texted BATRA his date of

5

1  birth, Social Security account number, and address. Melo also sent

2  BATRA a picture of Melo's driver's license.

3           b.     On April 2, 2019, shortly after Melo provided his PII

4  to BATRA, changes were made to Melo's Robinhood account. The phone

5  number Melo originally used to register the Robinhood account was

6  changed to BATRA's 310-666-4284 phone number. Melo's email address

7  was removed from the account and changed to

8  ab.supreme.invest11@gmail.com. Melo's address was also removed from

9  the account and replaced with BATRA'S APARTMENT address.

10          c.     On June 7, 2019, Melo's Robinhood account information

11  was again altered. BATRA'S APARTMENT address was changed to reflect a

12  fake address in Pasadena, a new phone number was added, and the email

13  address was changed. Melo testified he did not make these changes.

14  Based on my training and experience, and my knowledge of criminal

15  fraud schemes, the June 7, 2019 account changes were likely BATRA's

16  attempt to conceal the fact that BATRA took control of the Melo

17  Robinhood account.

18          d.     Financial records obtained during the course of my

19  investigation also show BATRA opened a number of bank accounts using

20  Melo's PII, then used these bank accounts to transfer money between

21  brokerage accounts. For example, on April 2, 2019, $15,000 was

22  deposited into the Melo Robinhood account from a Capital One checking

23  account ending in 5767 (the "5767 account"). Then on May 10, 2019,

24  $30,000 was withdrawn from the Melo Robinhood account into the 5767

25  account. Capital One account summary records show the 5767 account

26  was opened in Melo's name using Melo's personal information. Melo

27  testified he did not open the 5767 account or have any knowledge of

28  the account being opened in his name. Capital One provided the 5767

account summary, which listed BATRA'S APARTMENT as the mailing address. Thus, Capital One would have mailed BATRA's account statements to BATRA'S APARTMENT.

3.    On June 12, 2019, a TD Ameritrade brokerage account ending in 0163 was opened in Melo's name (the "0163 account"). Account summary documents provided by TD Ameritrade show the 0163 account was opened using Melo's name, date of birth, and Social Security number. The phone number used to open the 0163 account was BATRA's 310-666-4284 number, and the email address used was supreme.investments11@gmail.com. Melo testified he did not open or authorize the opening of the 0163 account. Thus it appears that BATRA used the PII he requested from Melo in March 2019 to open the 0163 account.

4.    There were a number of ACH deposits and reversals involving the 0163 account. For example, on June 12, 2019, $50,000 was deposited in the 0163 account. On June 20, 2019, the $50,000 was recalled from the 0163 account. Melo testified that he did not authorize the deposit or recall of this money. Tradestation account summary documents show the account was opened using Melo's date of birth and Social Security number. However, the telephone number linked to the 5372 account was BATRA's 310-666-4284 phone number, and the email address linked to the account was the same supreme.investments11@gmail.com address used to open the TD Ameritrade 0163 account.

5.    A Tradestation Securities account (the "5372 account") was also opened in Melo's name. Tradestation account summary documents show the account was opened using Melo's date of birth and Social Security number. However, the telephone number linked to the 5372

7

account was BATRA's 310-666-4284 phone number, and the email address linked to the account was the same supreme.investments11@gmail.com address used to open the TD Ameritrade 0163 account. Melo testified he did not open or authorize anyone else to open a Tradestation account in his name.

6.    According to Tradestation account statements, the 5372 account was used to conduct a number of options trades. For example, Tradestation records show options trading occurring from July 10 to July 30, 2019. Melo testified that he did not make nor have any knowledge of these trades. Tradestation account records also show a number of ACH deposits and withdrawals made from July through December 2019. Melo testified he had no knowledge of these deposits or withdrawals.

7.    Documents produced by Tradestation reveal two denied ACH requests made on July 2, 2019 and December 12, 2019. The bank accounts linked to the ACH requests were two Citibank checking accounts with the account titles "ABHI BATRA & Jonathan Melo" and "ABHI BATRA." Melo testified he never opened a Citibank checking account or held a joint checking account with BATRA.

8.    On July 2, 2019, a First Trade brokerage account ending in 2302 (the "2302 account") was opened in Melo's name.  First Trade account summary documents show the 2302 account was opened using Melo's mailing address, date of birth, Social Security number, and an image of Melo's driver's license. The email address linked to the 2302 account was once again the supreme.investments11@gmail.com email address used to open the TD Ameritrade 0163 and Tradestation 5372 accounts. Melo testified he never opened or authorized anyone to open a First Trade account in his name.

8

9.    According to First Trade account statements, the 2302 account was used to conduct options trading. Melo testified that he did not place these trades. First Trade account records also show a number of ACH transactions involving the 2302 account. For example, in December 2019, an ACH deposit of $10,000 and two ACH reversals totaling $40,000 occurred in the 2302 account. Melo testified that he did not order these ACH transactions.

10.   First Trade also produced documents showing a Citibank checking account ending in 1557 (the "1557 account") was linked to the 2302 account. Citibank records show BATRA is listed as the owner of the 1557 account, but that the account title is "Jonathan Melo." The 1557 account was registered to a fake address and listed the same supreme.investments11@gmail.com email address used to open the TD Ameritrade 0163 and Tradestation 5372 accounts. Melo testified that he never held any accounts with Citibank.

11.   In a July 2, 2019 email to First Trade, an individual claiming to be Melo used the supreme.investments11@gmail.com address to provide a fraudulent Citibank account statement to First Trade and requested First Trade authorize ACH transactions between the 2302 account and the Citibank 1557 account. Melo testified he did not send this email.

12.   Melo was not the only person that BATRA used to further his fraud scheme. For example, on March 5, 2020, lawyers from the SEC took the deposition testimony of Ksenia Pasochnik, BATRA's former roommate.

13.   A TD Ameritrade account summary shows an account ending in 0882 (the "0882 account") was opened in Pasochnik's name in October 2018. SEC financial analysis lists the 0882 account as a trading

9

Case 2:22-cr-00103-PA   Document 1   Filed 01/24/22   Page 18 of 27   Page ID #:18
Case 2:21-mj-00134-DUTY *SEALED*   Document 2-1 *SEALED*   Filed 01/11/21   Page 21 of
30   Page ID #:75

1  account BATRA used to further his fraud scheme. Pasochnik testified
2  she knew BATRA opened the 0882 account in her name, but Pasochnik did
3  not complete or review the account application. The 0882 account
4  application contained Pasochnik's signature, but Pasochnik testified
5  she did not remember signing the application. The 0882 account was
6  opened using BATRA'S APARTMENT address and the email address
7  cannabissupreme@gmail.com. Pasochnik testified this email address
8  belonged to BATRA.

9       14.   In her testimony, Pasochnik said she gave BATRA permission
10  to access the 0882 account to make trades. Pasochnik stated she
11  discussed trading strategies with BATRA, but BATRA was the one who
12  ultimately made the trades. TD Ameritrade account records show money
13  was transferred to the 0882 account between October and December
14  2018. Profitable trading activity followed, leading to an ending
15  account balance of $81,226.09.

16       15.   TD Ameritrade account records also show between October and
17  December 2018, approximately $72,000 was withdrawn from the 0882
18  account. Pasochnik testified she did not make these withdrawals or
19  receive any of the profits from the 0882 account. Pasochnik stated
20  BATRA had access to the 0882 account and likely withdrew the $72,000
21  to his personal bank account. TD Ameritrade records indicate all
22  trading activity ceased in the 0882 account after December 2018.

23       16.   Tastyworks, an online brokerage firm, provided records
24  showing that in June 2018, $18,000 was deposited in a Tastyworks
25  account opened in Pasochnik's name (the "0510 account"). SEC
26  financial analysis lists the 0510 account as a brokerage account
27  BATRA used to further his fraud scheme. Pasochnik testified BATRA
28  helped her open the 0510 account and had access to the account.

Case 2:22-cr-00103-PA   Document 1   Filed 01/24/22   Page 19 of 27   Page ID #:19
Case 2:21-mj-00134-DUTY *SEALED*   Document 2-1 *SEALED*   Filed 01/11/21   Page 22 of
30   Page ID #:76

17.    Tastyworks account records showed options trading occurred in the 0510 account in June 2018. Pasochnik testified she did not remember making the trades. 0510 account records also show that in June 2018, $25,000 was withdrawn from the account. Pasochnik testified she did not withdraw the funds or receive any of the money. Pasochnik also stated BATRA was the only other person with access to the 0510 account.

18.    Tastyworks account records also show that in July 2018, the 0510 account suffered trading losses of $20,000. Following these trading losses, four ACH reversals totaling $23,000 were made from the 0510 account. Bank of America account records show the ACH transactions were recalled to Pasochnik's Bank of America account. Pasochnik testified she did not order the reversals or know about the $23,000 in her account. Pasochnik also testified BATRA knew her Bank of America account number and login information and was the only other person who could access the account.

19.    Bank of America records show Pasochnik's checking account was also used to transfer money between Interactive Brokers, Lime, and Firstrade brokerage accounts. Pasochnik testified she never opened an account with Interactive Brokers, Lime, or Firstrade. Records provided by Firstrade show an account was opened in Pasochnik's name using her Social Security number and driver's license, copies of which were sent from the email address pbatra0923@gmail.com. Pasochnik testified BATRA used this email address, and only BATRA had copies of Pasochnik's Social Security card and driver's license.

20.    In addition to Melo and Pasochnik, BATRA opened and controlled brokerage and bank accounts in the names of at least six

11

1    other individuals to conceal BATRA's identity from authorities and

2    further his fraud scheme. SEC analysts prepared a spreadsheet of the

3    accounts BATRA controlled, which were held in his own name and the

4    names of Jonathan Melo, John Melo, Jon Melo, Ksenia Pasochnik,

5    Harivansh Batra, Poonam Baatra, Miranda Casillas, and Priyanka

6    Khanna. The accounts were opened at the following brokerages: Ally,

7    OptionsHouse, Lime, Charles Schwab, E-Trade Securities, Fidelity

8    Brokerage Services, Firstrade, Zacks Trade, Interactive Brokers,

9    Robinhood, Tastyworks, TD Ameritrade, Tradestation, and

10   OptionsXpress. BATRA opened bank accounts at Bank of America, Capital

11   One, Citibank, and Wells Fargo.  Business records show that the email

12   addresses used with these accounts include

13   ab.supreme.invest11@gmail.com, supreme.invest11@gmail.com,

14   pbatra0923@gmail.com, abhibatra11@gmail.com, abhinstrix@gmail.com,

15   cannabissupreme@gmail.com, and hbrubberinc@gmail.com.

16   **C.    Batra Fraudulently Recalled ACH Transfers after Suffering
        Trading Losses**

17

18        21.  In the course of my investigation, I learned that BATRA

19   frequently reversed ACH transfers to brokerage firms after suffering

20   trading losses by claiming he was the victim of fraud. SEC

21   investigators and lawyers provided me with recorded calls made to

22   financial institutions claiming that ACH transfers were fraudulent

23   and should be reversed. In many calls, the caller identified himself

24   as "Abhi Batra."  The voice in these "Abhi Batra" calls sounds

25   identical to the voice in an August 8, 2019 recorded phone call in

26   which a person claiming to be Melo requested Tradestation remove

27   trading limitations on daily loss limits for the Melo 5372 account.

28   Melo testified he was not the caller on this recorded phone call and

1 | that he recognized the voice as belonging to BATRA. The voice in the
2 | "Abhi Batra" calls also sounds identical to the voice of a person
3 | claiming to be Poonam Batra (BATRA's mother) in calls to financial
4 | institutions.

5 |     22.  On June 7, 2019, BATRA contacted Capital One using his true
6 | name to report fraudulent ACH transactions from the Capital One 5767
7 | account. The 5767 account is the same checking account linked to the
8 | Melo Robinhood, TD Ameritrade 0163, and Tradestation 5372 brokerage
9 | accounts. BATRA used BATRA'S APARTMENT address to verify his
10 | identity. BATRA claimed his Robinhood brokerage account was hacked,
11 | and the existing ACH link used to conduct $84,748.19 in fraudulent
12 | ACH transfers from the 5767 account in April and May 2019. ACH
13 | transfer records provided by Robinhood show that the reversals BATRA
14 | requested were withdrawn from the Melo Robinhood account. These ACH
15 | reversals followed trading losses of approximately $113,758.74 in the
16 | Melo Robinhood account.

17 |     23.  On December 10, 2019, BATRA called Citibank to file another
18 | fraud claim. BATRA verified his identity with BATRA'S APARTMENT
19 | address and his phone number, 310-666-4284. BATRA claimed $40,000 was
20 | fraudulently transferred to the Melo First Trade 2302 account in
21 | December 2019 from BATRA's Citibank account. BATRA stated he did not
22 | know Melo and did not authorize First Trade to transfer the money
23 | from BATRA's Citbank account. The ACH reversal followed trading
24 | losses of approximately $39,000 in the First Trade 2302 account.

25 | **D.    Summary of Batra's Trading Activity**

26 |     24.  I have personally reviewed brokerage statements, bank
27 | records, and SEC financial analysis. Based on my review of these
28 | documents and discussions with SEC attorneys and investigators, BATRA

13

1  sustained approximately $556,992.91 in trading losses during the life

2  of his fraud scheme, including under other persons' identities. BATRA

3  reversed approximately $1,134,548.00 in ACH transfers made to various

4  brokerage firms, causing approximately $665,211.10 in damages to

5  these brokerage firms. At the same time, BATRA made approximately

6  $98,478.00 in profits. As a result of BATRA's fraud, BATRA caused

7  approximately $765,000 in total financial losses due to BATRA's

8  illicit profits and brokerage firm losses.

9                **BATRA Resides at BATRA'S APARTMENT**

10     25.   Based on my investigation, there is probable cause to

11  believe evidence of BATRA's fraud is present at BATRA'S APARTMENT for

12  the following reasons:

13     26.   BATRA wrote rent checks to 1350 ROXBURY LLC that listed

14  BATRA'S APARTMENT as BATRA's address. These checks were paid during

15  the course of BATRA's fraud scheme and indicate BATRA resided at

16  BATRA'S APARTMENT while conducting online trading.

17          a.    On October 14, 2020, the SEC served a Wells Letter on

18  BATRA at BATRA'S APARTMENT, notifying BATRA of a potential SEC

19  enforcement action against him. In a response letter, BATRA indicated

20  he received this letter in the mail and wanted to negotiate a

21  settlement. This, in addition to database checks conducted during the

22  course of my investigation, indicate that BATRA still resides at

23  BATRA'S APARTMENT.

24          b.    Bank records indicate BATRA received account

25  statements related to BATRA's fraudulent activities at BATRA'S

26  APARTMENT. For example, Capital One provided an account summary for

27  the 5767 account linked to BATRA's fraudulent ACH transactions. The

28  account summary lists BATRA'S APARTMENT as BATRA's mailing address.

                                 14

1 | Thus, there is probable cause to believe BATRA maintains records of

2 | illicit bank transactions at BATRA'S APARTMENT.

3 |         c.    BATRA used specific Internet Protocol ("IP") addresses

4 | to conduct trading related to his fraud scheme. According to records

5 | subpoenaed from BATRA's Internet service provider, Charter

6 | Communications, several of these IP addresses resolved to BATRA'S

7 | APARTMENT as recently as January 14, 2020. BATRA frequently used one

8 | such IP address resolving to BATRA'S APARTMENT, 172.248.35.224, to

9 | conduct fraudulent online trading and bank transactions. This

10 | indicates records of BATRA's trading activity and the digital devices

11 | BATRA used to further his fraud scheme are located at BATRA'S

12 | APARTMENT.

13 |         d.    On December 15, 2020, U.S. Postal Service (USPS)

14 | Inspector and FBI Task Force Officer (TFO) Jeff Hedrick contacted the

15 | postal carrier responsible for delivering mail to BATRA'S APARTMENT.

16 | Through mail delivery records and his conversation with the postal

17 | carrier, TFO Hedrick was able to confirm that BATRA continued to

18 | receive mail at the BATRA'S APARTMENT.

19 |         **V.    TRAINING AND EXPERIENCE ON FRAUD OFFENSES**

20 |     27.   Based on my training and experience, and that of others in

21 | law enforcement who have decades of experience, individuals engaged

22 | in complicated financial schemes must keep records of those schemes

23 | just to execute them.  This is even more true when the criminal uses

24 | multiple identities and therefore must also keep track of which name

25 | and other identifying information corresponds to which account.

26 | Typically they keep these records close at hand and where they

27 | believe they are safe, most commonly in their homes.  Nowadays, the

28 | records are usually digital and stored on computers and smartphones,

and other digital devices.  In my training and experience, persons typically keep their smartphones where they are, typically their homes, places of work, and cars.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and

16

passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    29.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

       a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a

17

Case 2:22-cr-00103-PA  Document 1  Filed 01/24/22  Page 26 of 27  Page ID #:26
Case 2:21-mj-00134-DUTY *SEALED*  Document 2-1 *SEALED*  Filed 01/11/21  Page 29 of
30  Page ID #:83

1   search site all of the specialized manuals, equipment, and personnel
2   that may be required.

3            b.   Digital devices capable of storing multiple gigabytes
4   are now commonplace. As an example of the amount of data this equates
5   to, one gigabyte can store close to 19,000 average file size (300kb)
6   Word documents, or 614 photos with an average size of 1.5 MB.

7        30.   The search warrant requests authorization to use the
8   biometric unlock features of a device, based on the following, which
9   I know from my training, experience, and review of publicly available
10  materials:

11           a.   Users may enable a biometric unlock function on some
12  digital devices. To use this function, a user generally displays a
13  physical feature, such as a fingerprint, face, or eye, and the device
14  will automatically unlock if that physical feature matches one the
15  user has stored on the device. To unlock a device enabled with a
16  fingerprint unlock function, a user places one or more of the user's
17  fingers on a device's fingerprint scanner for approximately one
18  second. To unlock a device enabled with a facial, retina, or iris
19  recognition function, the user holds the device in front of the
20  user's face with the user's eyes open for approximately one second.

21           b.   In some circumstances, a biometric unlock function
22  will not unlock a device even if enabled, such as when a device has
23  been restarted or inactive, has not been unlocked for a certain
24  period of time (often 48 hours or less), or after a certain number of
25  unsuccessful unlock attempts. Thus, the opportunity to use a
26  biometric unlock function even on an enabled device may exist for
27  only a short time. I do not know the passcodes of the devices likely
28  to be found in the search.

Case 2:22-cr-00103-PA   Document 1   Filed 01/24/22   Page 27 of 27   Page ID #:27
Case 2:21-mj-00134-DUTY *SEALED*   Document 2-1 *SEALED*   Filed 01/11/21   Page 30 of
30   Page ID #:84

1       c.   Thus, the warrant I am applying for would permit law

2   enforcement personnel to, with respect to any device that appears to

3   have a biometric sensor and falls within the scope of the warrant:

4   (1) depress BATRA's thumb and/or fingers on the device(s); and (2)

5   hold the device(s) in front of BATRA's face with his or her eyes open

6   to activate the facial-, iris-, and/or retina-recognition feature.

7      31.   Other than what has been described herein, to my knowledge,

8   the United States has not attempted to obtain this data by other

9   means.

10                   **VII. <u>CONCLUSION</u>**

11      32.   For all the reasons described above, I request that the

12   Court issue the requested warrant. There is probable cause to believe

13   that evidence, contraband, fruits, or instrumentalities of the

14   SUBJECT OFFENSES, as described above and in Attachment B of this

15   affidavit, will be found in BATRA'S APARTMENT, as described in

16   Attachment A of this affidavit.

17

18   Attested to by the applicant in accordance
     with the requirements of <u>Fed. R. Crim. P. 4.1</u>

19   by telephone on this <u>11th</u> day of January,
     2021.

20

21   _John E. McDermott_

22

23   _____
     UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28